## WASHINGTON COUNTY.

### STATE *vs.* GEORGE N. KENYON.

Under Pub. Stat. R. I. cap. 214, § 40, which provides that "the husband or wife of any respondent in a criminal prosecution offering himself or herself as a witness, shall not be excluded from testifying therein because he or she is the husband or wife of such respondent:"

*Held*, that such husband or wife voluntarily appearing as a witness must testify
as if the marital relation did not exist.  The limitations of Pub. Stat. R. I.
cap. 214, § 36, as to civil cases do not extend to criminal.

At the trial of an indictment for murder when it did not appear that the de-
ceased made an overt attack on the defendant or that the defendant was in
apparent imminent danger :

*Held*, that evidence of threats made by the deceased against the defendant, was
properly excluded.

Witnesses cannot testify as to the reputation of a man from information gleaned
after his death.  Their evidence is mere hearsay and is inadmissible.

DEFENDANT'S petition for a new trial.

*Providence, February* 25, 1893.   STINESS, J.   The de-
fendant, indicted for the murder of John McInness, was con-
victed of manslaughter, and now petitions for a new trial
upon three grounds : *first*, that the court erred in its rulings ;
*second*, that the verdict was against the evidence ; *third*,
that one of the jurors had formed and expressed an opinion
before the trial.   The first error alleged by the defendant is
in the admission of his wife, Susan C. Kenyon, to be sworn
as a witness for the State, against his objection.

The rule of the common law, in criminal cases, which made
husband and wife incompetent as witnesses for or against
each other, has been modified in most of the States by statutes.
The modifications are by no means uniform.   They vary,
from making the testimony purely voluntary, or competent
by one in favor of, but not against the other ; to making it
fully competent and compellable both for and against the
other.   Under Pub. Stat. R. I. cap. 214, §36, in this State,
the husband and wife of either party are made competent
witnesses in civil cases :   "Provided, that neither shall be
permitted to give any testimony tending to criminate the
other or to disclose any communication made to him or her,
by the other, during their marriage."   Section 40 is as fol-
lows :   "The husband or wife of any respondent in a criminal
prosecution, offering himself or herself as a witness, shall
not be excluded from testifying therein because he or she is
the husband or wife of such respondent."

The statute relating to civil suits was passed in 1864, and
that relating to criminal prosecutions in 1872.   Prior to these

statutes neither husband nor wife could be a witness for or
against the other, except in cases of violence to the person
of the witness. *State* v. *Borden,* 6 R. I. 495. The first
digression from the common law, in civil cases, was carefully
guarded by the proviso; but, eight years later, when the
disqualification was removed in criminal cases, no restriction
whatever was imposed. The defendant argues that §§ 36,
40, should be construed together, as otherwise they are con-
tradictory. The two sections relate to distinct and in-
dependent, though related, subjects. One gives a rule of
evidence in civil and the other in criminal cases. It is not at
all necessary that they should be the same. Most of the
rules relating to the two classes of procedure are different,
but not on that account contradictory. If there were con-
tradictory or ambiguous provisions in the statute, undoubt-
edly we might look to other parts to get light upon the in-
tent and meaning of the whole. But the two sections are
neither contradictory nor ambiguous. Each for its purpose is
very plain. While in civil cases it is deemed wise to impose
certain restrictions, there are none in criminal cases. The
argument is that it is absurd to prohibit one from giving
testimony of a criminative or privileged character in a civil
suit, which involves only pecuniary damages, and not to pro-
hibit such testimony in a criminal suit, which involves the
liberty and reputation of a spouse. The propriety of the
statute we cannot pass upon. The reason for it may be
that given by the court in *State* v. *Black,* 63 Me. 210 : "It
might not accord with a good public policy to allow every liti-
gant in civil suits about matters however small to have the
right to search household secrets for the production of evi-
dence. But the State should have all possible constitutional
means to ferret out and punish crime." An examination of
section 40 leaves no room for doubt as to its meaning. The
husband or wife cannot be compelled to be a witness. There
must be a voluntary offer, and upon such offer there can be
no exclusion from testifying, because of the relationship to
the respondent. In other words, the witness is to testify as
though the relationship did not exist. For the purpose of

eliciting testimony the statute ignores the fact of marriage for the time being. Now if the court should exclude a witness from testifying to certain things on account of the relationship, we should violate the plain language of the statute, or else engraft into it the proviso, whose absence in this section is all the more significant from its presence in the preceding section, about civil suits. The legislature having laid down one rule for civil cases and another rule for criminal cases, we cannot suppose the intention to have been that the court should apply the same rule in both cases. If the same proviso was to be carried over to criminal cases it would have been most natural for the legislature to repeat it, or better still, to consolidate the rules, for there would then be no difference between them. In most cases the statute would operate for the benefit of a respondent. The spouse, being a voluntary witness, would only be likely to take the stand in case favorable testimony could be given, and for this purpose all restrictions should be removed. But there may also be cases where the shocking character of the crime or hopeless depravity of a respondent compels a spouse to speak, either for self-protection or in aid of justice; and in these cases, as well, if there is to be any testimony, it should be full testimony. When a husband or wife willingly testifies against the other there is little need for restriction upon the ground of endangering marital harmony. But, however we may regard the policy of the law, it is clear that the statute removes all incompetency, providing only that neither party can compel a spouse to be a witness. The incompetency being removed, the witness stands under this statute as free from restriction as any other witness.

In *Byrd* v. *State*, 57 Miss. 243, cited by the defendant; as also in *The People* v. *Briggs,* 60 How. Pr. 17, and *People* v. *Houghton*, 24 Hun, 501, the statute removed the incompetency only to the extent of allowing a husband or wife to be a witness *for* the other, and so did not allow one to be a witness *against* the other. The statutes were widely different from ours. The case of the *State* v. *McCord*, 8 Kans. 232, was very similar to the present one. There the statute

provides that no person should be incompetent to testify in a criminal case "by reason of being the husband or wife of the accused," but that no husband or wife should be *required* to testify except on behalf of the accused. It was held that the statute made a wife a competent witness and did not prevent her from giving her testimony voluntarily against her husband, although she could not have been required to give it. The only case in this State which bears at all upon this question is *State* v. *Briggs*, 9 R. I. 361, where it was held that a husband and wife might give testimony tending to criminate each other in a collateral criminal proceeding. The case, however, rested upon common law and not upon statutory grounds. We think the statute made the wife of the respondent a competent witness against her husband, upon her own offer to testify, and that none of her testimony could be excluded by reason of the fact that she was his wife.

The next exception presented by the defendant is the refusal of the court to permit him to offer evidence that the deceased had made threats to kill him within a short time of the homicide, unless it was shown that the defendant had knowledge of such threats before the homicide.

Evidence of this kind is admissible to support a justification of the homicide in self defence; and also to support the claim of an attack by the deceased, in the heat of which the homicide was committed, in order to reduce the character of the crime.

Such evidence bears upon the probability that the deceased was the aggressor; upon the character of the assault as disclosed by prior declaration, and consequently upon the defendant's reasonable apprehension of danger to himself. Whether the threats must have come to the knowledge of the defendant before the encounter is a question upon which there is a wide difference of opinion. In 2 Bishop on Criminal Procedure, 2d ed. § 630, it is said: "The doctrine very much prevails in our American books that such threats are admissible in evidence, provided they were known to the accused; otherwise, not." In Wharton on Criminal Evidence, 9th ed. § 757, it is stoutly maintained that, even if the defendant did

not know of the threats, they equally illustrate the character of the assault. We need not stop to examine the cases upon this point; for, whichever view might be taken of the limitation as to the defendant's knowledge, the threats, as Mr. Wharton says, *supra*, "are inadmissible, unless proof be first given that there was an overt act of attack, and that the defendant, at the time of the collision, was in apparent imminent danger." In this case the testimony falls far short of showing any attack or any danger at all, at the time of the shooting. According to the defendant's own statement, McInness neither attacked him nor got into the same room with him, nor even where he could see him. Kenyon had passed from his grist mill into his house, and gone into his room, opposite the front entrance, through one door of which, screened by a curtain, he could see McInness but could not be seen by the latter. When McInness, who roomed in the house, entered the hall, and was going in the direction of the defendant's room, Kenyon discharged a Winchester rifle, with which he stood awaiting his approach, and when he did not stop he fired again, mortally wounding him. McInness was unarmed but the defendant says that he threatened to kill him and that he fired the rifle to frighten and stop him, being himself in fear on account of a previous altercation in the mill. Taking the defendant's own statement, notwithstanding its contradiction by other testimony, as the basis for the evidence offered, it was clearly inadmissible. The use of a deadly weapon cannot be justified without evidence of an attack or apparent danger. Viewed from his standpoint, he shows no ground whatever to apprehend the danger which would justify him in shooting. He says that McInness had jumped upon him in the wheel pit of the mill and tried to drown him in the flume. But he at once took off his hands when Kenyon told him to do so. That danger, if any there was, had passed; they both had left the mill and had gone to the house; the defendant was secreted from view in his own room, and armed with a rifle. Aside from the threat, if there was one, there was no demonstration of a deadly intent on the part of McInness nor even of a simple assault.

The defendant says he thought that McInness was pursuing him with a knife or some other weapon, which he did not see. It was a summer day; McInness was dressed only in shirt and trousers; across the doorway, where the curtain was hung, was a sofa and a strip for hooks which so completely barricaded it that McInness could not have reached Kenyon with a knife, and there was no suggestion of any other weapon. There was no danger at all when the shots were fired. To have entered the room he must have passed the curtained doorway to the unobstructed doorway at the other end of the hall. Whether McInness was making for the doorway or only for the stairway opposite the curtain when the shots were fired did not appear. There was not only no evidence of an assault but no clear evidence even of a pursuit.

Under such circumstances evidence of previous threats was plainly irrelevant; for they could not justify the use of the deadly weapon, nor illustrate the character of an attack when no attack was made. The verdict of manslaughter gave to the defendant all the benefit of fear and lack of malice that could have been given under the evidence offered.

The defendant also claims error in the refusal to admit witnesses to testify to the reputation of the deceased for quarrelsomeness, unless they had known of the reputation before the homicide. We think this was no error. Reputation is a fact and is to be proved as any other fact by the witnesses who know it. If witnesses were offered who did not know of his reputation in his life time they could not testify to it; for information acquired since, from others, is simply the baldest hearsay. *State* v. *Forskner*, 43 N. H. 89.

Upon the second ground of the petition it is sufficient to say that in our opinion the evidence fully sustains the verdict of the jury.

The third ground, that one of the jurors had formed and expressed an opinion before the trial, is not, in our opinion, sustained by the evidence adduced.

*Petition for new trial denied.*

*Robert W. Burbank,* Attorney General, for the State.

*George J. West,* for defendant.